# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JOHN E. VEST<br>1391 Bennett School House Rd<br>Wheelersburg, OH 45691 | CIVIL ACTION NO.: 2:18-cv-70 |
| AND | JUDGE: _____ |
| PAMELA K. VEST<br>1391 Bennett School House Rd<br>Wheelersburg, OH 45691<br><br>           Plaintiffs, | **COMPLAINT FOR MEDICAL MALPRACTICE AND RELATED TORTS** |
|     vs. | |
| THE UNITED STATES OF AMERICA<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br><br>           Defendant. | |

## FACTS COMMON TO ALL CLAIMS

1. This action arises under the Federal Tort Claims Act (FTCA).

2. Jurisdiction is proper pursuant to 28 U.S.C.A. § 1346(b)(1) and 28 U.S.C.A. §§ 2671 to 2680.

3. An administrative claim was filed with the Department of Veterans Affairs, VA Regional Office on June 21, 2017. (See Exhibit 1 attached hereto, Standard Form 95-Claim for Damage, Injury or Death.)

4. As of January 2, 2018, the Department of Veterans Affairs failed to make final disposition of Plaintiffs' administrative claim, thereby denying such claim in accordance with 28 U.S.C. § 2675(a).

5. This action properly lies in the Southern District of Ohio, Eastern Division, pursuant to 28 U.S.C. § 1391(b), because a substantial part of events or omissions giving rise to the claim occurred within this judicial district.

6. Plaintiffs John E. Vest and Pamela K. Vest were and are, at all relevant times, residents of Minford, Ohio, which lies within Scioto County, Ohio.

7. Plaintiff John Vest received treatment at Chillicothe VA Medical Center, which lies within Ross County, Ohio.

8. Defendant, Chillicothe VA Medical Center (hereinafter "Defendant VA"), an entity of the United States government, provides medical care to veterans through its actual and ostensible agents, employees, and members.

9. Defendant VA engaged in behavior, more fully described below, which rose to a level of negligence that would give rise to liability, under negligence and medical malpractice theories, if the United States government were a private person.

10. Plaintiff John Vest has a past medical history consisting of known coronary artery disease which first presented in 2007.

11. In the period between May 21, 2010, and April, 2012, Plaintiff John Vest underwent additional cardiac evaluation for presentations with chest pain.

12. On February 10, 2016, Plaintiff John Vest presented to the Southern Ohio Medical Center ("SOMC") emergency department with complaints of chest pain radiating to his jaw for one week. High-risk chest discomfort was noted in the documentation, but no acute EKG changes or troponin elevations were found. The chest pain was documented to have resolved, and the

recommendations given to the Plaintiff included a follow-up with cardiology for a stress test as well as pulmonology for evaluation of his shortness of breath.

13. On February 24, 2016, Plaintiff John Vest presented to Defendant VA as an outpatient and reported chest pain as one of his presenting complaints. No additional cardiac evaluation was ordered by the clinicians and Plaintiff John Vest was instead referred for mental health evaluation.

14. Within the VA records on the same day, February 24, 2016, is a triage phone call in which Plaintiff states that he "needs to be seen by pulmonary and cardiology." No documentation supports a referral to either specialty or a plan for additional cardiac evaluation.

15. On June 10, 2016, during evaluation for dyspnea by the VA pulmonology, coronary heart disease was mentioned as part of the differential diagnosis for his presenting complaints.

16. Plaintiff John Vest was eventually seen by the VA cardiology department on June 30, 2016. His chest pain was noted to be more frequent and more intense and now beginning to occur at rest. Cardiology's assessment at that time mentions unstable angina, and a STAT stress test was recommended to evaluate his condition.

17. Despite this recommendation, there is no documented evidence that the recommended STAT stress testing was scheduled. The physical exam documented during this visit makes no mention of signs of heart failure.

18. Defendant VA's failure to schedule the cardiac testing in an expedited fashion, as recommended by the treating physician, at that time represented substandard care and a deviation from expected practices. [Affidavit of Merit, Exhibit A.]

19. On July 12, 2016, Plaintiff John Vest presented to Defendant VA as an unscheduled clinic appointment for worsening shortness of breath. His physical exam at that time was consistent with new onset heart failure.

20. Further consequences manifested themselves on July 16, 2016, when Plaintiff John Vest presented to Adena emergently with a NSTEMI and worsening heart failure. An echocardiogram conducted at that time demonstrated an EF of 35%, which represented new systolic dysfunction directly resulting from untreated coronary artery disease. Additionally, his ventricle had enlarged (LVIDd noted to be 6.2 cm), and a left heart catheterization confirmed severe progressive coronary artery disease in a pattern that is not consistent with sudden onset, but rather from subacute progression (collateralization). Subsequent attempts at surgical revascularization were complicated by postoperative cardiogenic shock.

21. A follow-up evaluation on August 16, 2016, documents ongoing heart failure.

22. Plaintiff John Vest's substandard treatment of his coronary heart disease at the VA led to his heart failure and LV systolic dysfunction. The occurrence of heart failure for Mr. Vest has direct consequences on his life expectancy.

23. Heart failure is known to have an extremely high mortality, estimated to be 50% at five years and 10% at 10 years. Furthermore, reduced systolic function is known to be associated with an increased risk of sudden cardiac death. In addition to mortality risk, the diagnosis of heart failure carries with it a high probability of hospitalizations as part of the disease process.

24. Plaintiff John Vest is at risk for all these worsening outcomes given his resultant heart failure and, therefore, suffered a loss of chance. Severe progression of heart failure may well

also demand advanced surgical therapies such as cardiac transplantation or mechanical circulatory support.

25. Plaintiff John Vest's undertreated coronary artery disease at the VA played a critical role in the timing and severity of his eventual heart failure presentation. Plaintiff John Vest is now subjected to a lifetime of ongoing medical care, medical therapies, potential hospitalizations, and possible device therapies such as an Implatable Cardioverter Defibrillator ("ICD") because of Defendant VA's failure to adhere to acceptable clinical standards for "STAT" testing.

26. Alternatively, Defendant caused a loss of opportunity to appropriately treat Mr. Vest that would more likely than not would have prevented his heart failure. Plaintiff John Vest now has a lifelong, incurable medical condition as a consequence.

27. Plaintiff has incurred out-of-pocket medical expenses due to the malpractice by Defendant VA, from whom he sought treatment in June 2016 because he did not have health insurance given his right to the VA benefits.

28. Plaintiff has incurred and will continue to incur both medical expenses and other financial losses as a result of Defendant VA's negligence.

29. Due to Defendant VA's negligence, Plaintiffs' are claiming the following damages: A) current medical expenses of $339,859.23; B) future medical expenses of $1,000,000; C) pain, suffering and loss of enjoyment of life of $500,000; and D) Plaintiff Pamela Vest's consortium claim of $100,000.

30. The emotional suffering of Defendant VA's negligence on Plaintiff John Vest has likewise been as significant.

31. Plaintiffs' total claim for damages is One Million Nine Hundred Thirty-Nine Thousand Eight Hundred Fifty-Nine Dollars and Twenty-three cents ($1,939,859.23).

## COUNT ONE – NEGLIGENCE

32. Plaintiff realleges paragraphs 1 through 31 as if fully rewritten herein.

33. On or about June 30, 2016, Defendant VA breached the standard of care owed to Plaintiff John Vest by negligently failing to adhere to acceptable clinical standards for "STAT" testing resulted in a loss of opportunity to appropriately treat Mr. Vest and would more likely than not have prevented his heart failure.

34. As a direct and proximate result of Defendant VA's failure to treat Plaintiff John Vest and observe him, Plaintiff John Vest sustained the injuries and losses set forth herein as he suffered heart failure and the lost opportunity to receive treatment preferred to prevent or to eliminate or nearly eliminate the physical and psychological deficits caused by the heart failure.

35. Defendant VA's negligence proximately caused Plaintiff John Vest to suffer a loss of a chance of having a substantially improved outcome in his physical condition following his heart failure compared to the outcome he did receive.

36. Defendant's negligent acts or omissions increased the risk of harm to the Plaintiff John Vest, and in fact did cause him harm, including a substantially reduced life expectancy.

37. As a further direct and proximate result of the negligence of Defendants, Plaintiff John Vest has been forced to endure, both to date and on a permanent basis, prolonged pain and suffering, and has caused Plaintiffs to incur medical expenses in excess of $339,859.23 from the date of Defendant's negligence until now, and which will increase in the future.

38. Plaintiffs further state that all of the injuries, losses and damages, many of which are permanent, were, are and will be the proximate result of the negligence of Defendant, without any negligence on the part of the Plaintiffs contributing thereto.

39. Liability is imposed upon the Defendant for breach of the standard of care pursuant to the FTCA.

## COUNT TWO – PROFESSIONAL NEGLIGENCE

40. Plaintiff realleges paragraphs 1 through 39 as if fully rewritten herein.

41. Defendant VA holds itself out as a professional provider of medical services in the Chillicothe, Ohio area.

42. As such, Defendant VA had a duty to provide such services in compliance with the standard of care prevalent in his community.

43. On or about June 30, 2016, Defendant VA breached the professional standard of care due and owing to Plaintiff John Vest.

44. By failing to admit Plaintiff for observation and evaluation when he presented symptoms indicating that a heart failure was occurring, or had a substantial likelihood of occurring within the next few days, Defendant VA proximately caused Plaintiff John Vest to sustain a loss of a chance of avoiding heart failure altogether or having a full or greater recovery from the heart failure.

45. As a proximate result of that breach, Plaintiffs have sustained injuries and losses as set forth herein.

46. The Affidavit of Merit of Sitaramesh Emani, MD, together with its incorporated attachment, is attached as Exhibit 2 and incorporated herein as required by Ohio Rule of Civil Procedure 10.

47. Liability is imposed upon the Defendant for breach of the standard of care pursuant to the FTCA.

## COUNT THREE – LOSS OF CONSORTIUM

48. Plaintiff realleges paragraphs 1 through 47 as if fully rewritten herein.

49. As a direct and proximate result of Defendant VA's actions as outlined herein, Plaintiff Pamela Vest, as the spouse of John Vest, at and since the time of the accident, has sustained and will continue to sustain a loss of consortium, due to her losses of the services, companionship, comfort, and solace of her husband, Plaintiff John Vest.

50. Liability is imposed upon the Defendant for breach of the standard of care pursuant to the FTCA.

**WHEREFORE**, Plaintiffs John and Pamela Vest pray for judgment against the Defendant named herein as to Count One, Two and Three in an amount of $1,939,859.23 plus the costs of this action herein, and for reasonable attorneys' fees, and for whatever other relief this court deems appropriate in equity or at law.

Respectfully submitted,

/s/ Daniel J. Fruth
DANIEL J. FRUTH (0075309)
STEBELTON SNIDER, LPA
109 North Broad Street, Suite 200
P.O. Box 130
Lancaster, OH 43130
Tel: (740) 654-4141; Fax: (740) 654-2521
Email: djf@stebelton.com
Attorney for Plaintiffs John and Pamela Vest
(2018 01 26 Complaint)

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse) Number, Street, City, State and Zip code. |
|---|---|
| Department of Veterans Affairs<br>Office of Chief Counsel<br>441 Wolf Ledges Parkway, Ste. 403<br>Akron, OH 44331 | Claimant: John E. Vest, Jr., P.O. Box 247, Minford, OH 45653<br>Representative: Daniel J. Fruth, Stebelton Snider, LPA, 109 N Broad St., Ste. 200, Lancaster, OH 43130 |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY ☒ CIVILIAN | 4. DATE OF BIRTH<br>09/08/1959 | 5. MARITAL STATUS<br>Married | 6. DATE AND DAY OF ACCIDENT<br>06/30/2016  Thursday | 7. TIME (A.M. OR P.M.)<br>11:11 A.M. |
|---|---|---|---|---|

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

See attached Exhibits 1-11, incorporated herein.

9. PROPERTY DAMAGE

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code)

None.

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED (See instructions on reverse side).

Not applicable.

10. PERSONAL INJURY/WRONGFUL DEATH

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

See attached Exhibits 1-11, incorporated herein.

11. WITNESSES

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| John E. Vest, Jr. | P.O. Box 247, Minford, OH 45653 |
| Pamela Vest | P.O. Box 247, Minford, OH 45653 |

12. (See instructions on reverse). AMOUNT OF CLAIM (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| 0.00 | 2,000,000 | 0.00 | 2,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side).<br>X /s/ John E. Vest Jr. | 13b. PHONE NUMBER OF PERSON SIGNING FORM<br>740-961-1302 | 14. DATE OF SIGNATURE<br>06/19/2017 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable
95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

EXHIBIT 1

| INSURANCE COVERAGE ||
|---|---|
| In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property. ||
| 15. Do you carry accident Insurance? ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☒ No ||
| 16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?   ☐ Yes  ☒ No | 17. If deductible, state amount. 0.00 |
| 18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts). Not applicable. ||
| 19. Do you carry public liability and property damage insurance? ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☒ No ||

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

**(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

# STANDARD FORM 95 - SECTION 8

Included in the supporting information are copies of the following exhibits:

1. Chillicothe VA Medical Center medical records
2. Adena Medical Center medical records
3. Ohio State University Wexner Medical Center medical records
4. Cincinnati VA Medical Center medical records
5. Southern Ohio Medical Center medical records
6. Medical Specials:
    - Adena Medical Center billing
    - OSU Medical Center billing
7. Medical Specials summary
8. Statement of John Vest, Jr.
9. Statement of Pamela Vest
10. Sitaramesh Emani, MD, Advanced Heart Failure & Cardiac Transplant, Affidavit of Merit
11. Standard Form 95 for Pamela Vest

## AFFIDAVIT OF MERIT OF SITARAMESH EMANI, MD

Sitaramesh Emani, MD, after being first duly sworn, states the following to be true:

1. I submit this Affidavit of Merit in accordance with Ohio Rule of Civil Procedure 10(D)(2)(a)

2. I am licensed to practice medicine by the Medical Board of Ohio and am Board Certified in Internal Medicine, Cardiovascular Disease, and Advanced Heart Failure & Transplant Cardiology.

3. I devote at least one-half of my professional time to active clinical practice of medicine or to its instruction at an accredited school.

4. I have reviewed all medical records reasonably available to Mr. John Vest concerning the allegations of negligence against employees of the Veterans Administration as outlined in my report of June 6th, 2017 relative to the care of Mr. Vest.

5. I am familiar with the applicable standards of care in this matter.

6. In my opinion the standards of care were breached by the clinicians at the Chillicothe VA Medical Center and such breaches were the direct and proximate causes of injuries to Mr. Vest as outlined in my opinion letter of June 6, 2017 which is attached hereto as Exhibit A and is incorporated into this Affidavit herein.

_____
Sitaramesh Emani, MD

STATE OF OHIO, COUNTY OF FRANKLIN, SS:

Before me, a Notary Public in and for said County and State, personally appeared the above-named Sitaramesh Emani, MD, who acknowledged that he did sign the foregoing instrument and that the same is his free and voluntary act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at Columbus, Ohio this the 12th day of June, 2017.

_____
NOTARY PUBLIC - STATE OF OHIO

TERESA M. HENDERSON
Notary Public, State of Ohio
My Commission Expires 10-30-2017

**EXHIBIT 2**

June 6, 2017

Stebelton &Snider
Daniel J. Fruth
109 North Broad Street, Suite 200
Lancaster, OH 43130

Dear Mr. Fruth:

As you requested, I have conducted a review of the medical records of your client, Mr. John Vest. My review includes the records generally covering the period from May 21, 2010, through August 16, 2016, and includes information obtained from the following sources:

Cincinnati VA Medical Center
Chillicothe VA Medical Center
Adena
SOMC
Ohio State University Wexner Medical Center

Mr. Vest has a past medical history consisting of known coronary artery disease which first presented in 2007 as part of acute myocardial infarction. At that time he underwent a percutaneous intervention to his right coronary artery. His additional medical history includes hypertension, type II diabetes, PTSD, obesity, history of smoking, sleep apnea, and diabetic neuropathy.

In the period between May 21, 2010, and April, 2012, he underwent additional cardiac evaluation for presentations with chest pain. During this evaluation, multivessel coronary artery disease was noted (based on left heart cath performed in June, 2011); his coronary disease was initially managed medically due to borderline FFR findings and stress test results. Subsequently, however, the patient ended up undergoing a left heart catheterization in April, 2012, with two drug-eluting stents placed. Of note, on a follow-up cardiology evaluation on November 20, 2012, the exertional component of his chest pain was noted to have improved following this intervention.

The patient did undergo an additional stress test on December 3, 2014, which demonstrated a fixed apical defect with some surrounding reversibility. Of importance, his ejection fraction was noted to be 61% at that time. Between this point and February 2016, the patient was managed medically for his coronary artery disease and intermittent chest discomfort.

On February 10, 2016, the patient presented to the SOMC emergency department with complaints of chest pain radiating to his jaw for one week. High-risk chest discomfort was noted in the documentation, but no acute EKG changes or troponin elevations were found. The chest pain was documented to have resolved, and the

EXHIBIT A

recommendations given to the patient included a follow-up with cardiology for a stress test as well as pulmonology for evaluation of his shortness of breath. A follow-up phone call by the Chillicothe VA on February 22, 2016, notes that the patient was refusing triage first chest pain. It is unclear what form of triage was being offered. Specifically, no mention is made of a referral to cardiology or stress testing.

On February 24, 2016, and an outpatient visit, the patient reports chest pain as part of his presenting complaints. The documented assessment states an unclear etiology of his chest pain without specific mention of coronary artery disease is a cause despite his known medical history. No additional cardiac evaluation is recommended in the patient is referred to mental health. Documented within the VA records on the same day is a triage phone call in which the patient states that he "needs to be seen by pulmonary and cardiology." No documentation supports a referral to either specialty or a plan for additional cardiac evaluation.

On June 10, 2016, during evaluation for dyspnea by pulmonology, coronary heart disease is mentioned as part of the differential diagnosis for his presenting complaints, and in particular radiating chest pain with exertion. Of note, a chest CT obtained at that time did not demonstrate any enlargement of his heart or mediastinum.

Mr. Vest was eventually seen by cardiology on June 30, 2016. His chest pain was noted to be more frequent and more intense and now beginning to occur at rest. Cardiology assessment at that time mentions unstable angina, and a STAT stress test is recommended to evaluate. Despite this recommendation, there is no documented evidence that the recommended testing was scheduled. Of particular importance, the physical exam documented during this visit has no mention of signs of heart failure.

It is my medical opinion that failure to schedule the cardiac testing in an expedited fashion, as recommended by the cardiologist, at this time represents substandard care and a deviation from expected practices. Shortly after this point, Mr. Vest began to experience consequences of the ignored recommendations. On July 12, 2016, he presented as an unscheduled clinic appointment for worsening shortness of breath. His physical exam at that time was consistent with new onset heart failure, and is supported by an elevated BNP of 1645. Although he refused an ED admission for workup, documentation shows that this was due to his understanding that the previously recommended cardiac testing was already scheduled to be done in an expedited fashion.

Further consequences manifested themselves on July 16, 2012, when he presented to Adena emergently with a NSTEMI and worsening heart failure. An echocardiogram done at that time demonstrated an EF of 35%, which represented new systolic dysfunction directly resulting from untreated coronary artery disease. Additionally, his ventricle had enlarged (LVIDd noted to be 6.2 cm), and a left heart

catheterization confirmed severe progressive coronary artery disease in a pattern that is not consistent with sudden onset, but rather from subacute progression (collateralization). Subsequent attempts at surgical revascularization were complicated by postoperative cardiogenic shock. And follow-up evaluation on August 16, 2016, documents ongoing heart failure (supported by a BNP of 547).

Mr. Vest's substandard treatment of his coronary heart disease led to his heart failure and LV systolic dysfunction. The occurrence of heart failure for Mr. Vest has direct consequences on his life expectancy. Heart failure is known to have an extremely high mortality, estimated to be 50% at five years and 10% at 10 years.[1-3] furthermore, reduced systolic function is known to be associated with an increased risk of sudden cardiac death.[4] In addition to mortality risk, the diagnosis of heart failure carries with it a high probability of hospitalizations as part of the disease process.[5] Mr. Vest is at risk for all these worsening outcomes given his resultant heart failure. Severe progression of heart failure may also warrant an evaluation for advanced surgical therapies such as cardiac transplantation or mechanical circulatory support.[6]

Although Mr. Vest has several risk factors for the development of heart failure, his coronary artery disease is the most prominent.[7] Importantly, his undertreated coronary artery disease certainly played a critical role in the timing and severity of his eventual heart failure presentation.[8] He is now subjected to a lifetime of ongoing medical care, medical therapies, potential hospitalizations, and possible device therapies such as an ICD.[6] It is my opinion, as both a board certified general cardiologist and board-certified advanced heart failure/cardiac transplant cardiologist, that failure to adhere to acceptable clinical standards for "STAT" testing resulted in a loss of opportunity to appropriately treat Mr. Vest and would more likely than not have prevented his heart failure. He now has a lifelong, incurable medical condition as a consequence.

Sitaramesh Emani, MD
Advanced Heart Failure & Cardiac Transplant

*References*

1. Cowie MR, Wood DA, Coats AJ, et al. Survival of patients with a new diagnosis of heart failure: a population based study. Heart 2000;83:505-10.
2. MacIntyre K, Capewell S, Stewart S, et al. Evidence of improving prognosis in heart failure: trends in case fatality in 66 547 patients hospitalized between 1986 and 1995. Circulation 2000;102:1126-31.
3. Mosterd A, Cost B, Hoes AW, et al. The prognosis of heart failure in the general population: The Rotterdam Study. Eur Heart J 2001;22:1318-27.
4. Chugh SS, Reinier K, Teodorescu C, et al. Epidemiology of sudden cardiac death: clinical and research implications. Prog Cardiovasc Dis 2008;51:213-28.

4

5. Roger VL. Epidemiology of heart failure. Circ Res 2013;113:646-59.
6. Yancy CW, Jessup M, Bozkurt B, et al. 2013 ACCF/AHA guideline for the management of heart failure: a report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines. J Am Coll Cardiol 2013;62:e147-239.
7. Schocken DD, Benjamin EJ, Fonarow GC, et al. Prevention of heart failure: a scientific statement from the American Heart Association Councils on Epidemiology and Prevention, Clinical Cardiology, Cardiovascular Nursing, and High Blood Pressure Research; Quality of Care and Outcomes Research Interdisciplinary Working Group; and Functional Genomics and Translational Biology Interdisciplinary Working Group. Circulation 2008;117:2544-65.
8. Flaherty JD, Bonow RO, Gheorghiade M. Heart Failure as a Consequence of Ischemic Heart Disease. In: Mann DL, Felker GM, eds. Heart Failure: A Companion to Braunwald's Heart Disease. 3rd ed. Philadelphia, PA: Elsevier; 2016:282-9.